| District Court, Denver County, Colorado<br>Denver City and County Building<br>1437 Bannock Street, Denver, CO 80202 | DATE FILED: January 19, 2023 2:22 PM<br>FILING ID: E1D2F89574FA0<br>CASE NUMBER: 2023CV30188 |
|---|---|
| **Plaintiff:**<br><br>THOMAS AARON YANNUZZI;<br><br>v.<br><br>**Defendants:**<br><br>CITY AND COUNTY OF DENVER;<br>MARLEY BORDOFSKY, Denver Assistant City Attorney;<br>AARON REBETERANO, Denver Police Lieutenant;<br>MIKE O'DONNELL, Denver Police Commander;<br>HEATHER JOSSI, Denver Police Officer;<br>JOE MONTOYA, Denver Police Division Chief. | |
| | σ COURT USE ONLY σ |
| Adam Frank, # 38979<br>Cameron Bedard, #52362<br>Frank Law Office LLC<br>1133 N Pennsylvania St.<br>Denver, CO 80203<br>Phone: (303) 800-8222<br>Fax: (303) 800-9122<br>adam@franklawoffice.com<br>cameron@franklawoffice.com | Case No.<br><br><br><br><br><br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Aaron Yannuzzi, by and through his counsel, Adam Frank and Cameron Bedard of Frank Law Office, LLC, respectfully alleges for his Complaint and Jury Demand as follows:

## **INTRODUCTION**

1.        On Inauguration Day, January 20, 2021, Plaintiff Thomas Aaron Yannuzzi went to Cheeseman Park to participate in a nonviolent political demonstration against the "Stop the Steal" protest being carried out by a group of right-wing protestors at the State Capitol.

2.        Within minutes of arriving at Cheeseman Park and meeting with a small group of fellow protestors, Mr. Yannuzzi encountered teams of Denver Police Department ("DPD") tactical special operations forces clad in riot gear and wielding machine guns.

3.        One of the DPD officers, Defendant Heather Jossi, observed Mr. Yannuzzi standing in the park wearing black clothing and carrying a backpack. He had no visible weapons. Defendant Jossi had no information he had violated any law. He posed no apparent threat to anyone's safety.

Without legal authority, Defendant Jossi stopped Mr. Yannuzzi, grabbed him, and searched him, violating his rights under article II, section 7 of the Colorado Constitution.

4.      Defendant Jossi was following unconstitutional orders given by her Commander, Defendant Mike O'Donnell, to carry out a policy of mass searches and seizures of protestors. These orders represented the implementation of an unconstitutional mass search and seizure policy that Denver created in anticipation of Inauguration Day protests.

5.      Defendant Aaron Rebeterano, a DPD Lieutenant, authored this unconstitutional mass search and seizure policy. Defendant Rebeterano additionally created a PowerPoint presentation to be used to instruct DPD line officers on how to implement the policy.

6.      Defendant Marley Bordofsky, a Denver City Attorney, performed a legal review of Defendant Rebeterano's unconstitutional mass search and seizure policy and approved it. Defendant Bordofsky determined that the mass search and seizure policy was lawful even though it was plainly unconstitutional, as it authorized DPD officers to stop and search protestors without individualized reasonable suspicion or probable cause.

7.      Defendant Montoya, DPD's Division Chief for Investigations, approved the unconstitutional mass search and seizure policy for implementation and directed his officers to execute the unconstitutional policy against the Inauguration Day protestors, including Mr. Yannuzzi.

8.      On Inauguration Day, Defendant O'Donnell was assigned the role of Operations Commander. He instructed his line officers, including Defendant Jossi to carry out the unconstitutional mass search and seizure policy against the protestors.

9.      In this way, Denver established and executed an unconstitutional policy that directly led to Defendant Jossi's violation of Mr. Yannuzzi's constitutional rights.

10.     On Inauguration Day, Defendant Jossi observed Mr. Yannuzzi standing in Cheeseman Park wearing a backpack and black clothes. Mr. Yannuzzi was preparing to march to the Capitol as part of a political demonstration. Under Denver's unconstitutional mass search and seizure policy, dressing in black and wearing a backpack to a protest was sufficient to stop and search Mr. Yannuzzi and countless others like him.

11.     Denver's unconstitutional mass search and seizure policy, as carried out by the Defendants, sent a chilling message to persons whose political views are in apparent opposition to the political goals of Denver and the DPD: if you protest, we will stop and search you.

12.     DPD should already know that there are consequences for violating protestors rights. The unconstitutional actions described herein were committed in the wake of DPD's deplorable conduct during the George Floyd protests, conduct that resulted in Denver paying out millions of dollars to people whose rights they violated. On December 9, 2020, the day the Office of the Independent Monitor published an investigative report excoriating DPD for its "extremely troubling police tactics" during the George Floyd protests, Denver's Police Chief Paul Pazen promised to improve the way DPD officers engage protestors.

13.     Six weeks later, Denver made clear through its actions that Chief Pazen's promises to implement reforms to how Denver polices protests meant nothing. Rather than change its ways,

2

Denver responded to anticipated protests by explicitly planning to violate the protestors' constitutional rights. Mr. Yannuzzi brings this complaint to vindicate the rights of protestors to demonstrate, freely assemble, freely associate, and live free from unreasonable searches and seizures.

## JURISDICTION & VENUE

14.     This Court has jurisdiction under C.R.S. § 13-1-124(b).

15.     Venue is proper under C.R.C.P. 98(c)(5).

## PARTIES

16.     At all times relevant to this Complaint, Plaintiff Thomas Aaron Yannuzzi was a citizen and resident of Denver County and the State of Colorado.

17.     Defendant City and County of Denver ("Denver") is a municipality organized under the laws of the State of Colorado. Defendant Denver enforces local and state law through its law enforcement agency, DPD. At all times relevant to this Complaint, Denver employed and was responsible for the oversight, supervision, discipline, and training of DPD personnel, including the Defendant officers.

18.     At all times relevant to this Complaint, Defendant Officer Heather Jossi was a peace officer acting within the scope of her official duties and employment and under color of state law in her capacity as a DPD police officer. At all relevant times, Defendant Jossi was a citizen and resident of the State of Colorado.

19.     At all times relevant to this Complaint, Defendant Lieutenant Aaron Rebeterano was a peace officer acting within the scope of his official duties and employment and under color of state law in his capacity as a DPD police officer. At all relevant times, Defendant Rebeterano was a citizen and resident of the State of Colorado.

20.     At all times relevant to this Complaint, Defendant Commander Mike O'Donnell was a peace officer acting within the scope of his official duties and employment and under color of state law in his capacity as a DPD police commander. At all relevant times, Defendant O'Donnell was a citizen and resident of the State of Colorado.

21.     At all times relevant to this Complaint, Defendant Division Chief Joe Montoya was a peace officer acting within the scope of his official duties and employment and under color of state law in his capacity as Division Chief for DPD. At all relevant times, Defendant Montoya was a citizen and resident of the State of Colorado.

22.     At all times relevant to this Complaint, Defendant Marley Bordofsky was acting within the scope of her official duties and employment and under color of state law in her capacity as the head of the Prosecutions Division for Denver's City Attorney's Office. At all relevant times, Defendant Bordofsky was a citizen and resident of the State of Colorado.

## FACTUAL ALLEGATIONS

### A. Mr. Yannuzzi Went to Cheeseman Park to Join a Nonviolent Protest

23.    On Inauguration Day, January 20, 2021, Mr. Yannuzzi met up with a group of fellow protestors at Cheeseman Park in Denver to begin a day of nonviolent political demonstration.

24.    Mr. Yannuzzi and his fellow protestors met at Cheeseman Park to begin a march to the Colorado State Capitol to stand up against right wing political forces that planned actions at the Capitol as part of the "Stop the Steal" movement.[1]

25.    Mr. Yannuzzi learned about the counter-protest from a Facebook post announcing that counter-protestors planned to meet at Cheeseman Park before marching to the Capitol.

26.    At approximately 10:00 a.m., Mr. Yannuzzi arrived at Cheeseman Park.

27.    Shortly after Mr. Yannuzzi's arrival, DPD police trucks arrived at the park.

28.    The DPD police trucks transported officers from the tactical forces unit known as the DPD Special Operations Response Team.



29.    Mr. Yannuzzi watched as dozens of DPD officers clad in riot gear and carrying military-style assault rifles exited the police trucks and began approaching protestors who were standing in the park.

---

[1] "Stop the Steal" is a movement that believed President Biden stole the 2020 election from Donald Trump. How 'Stop the Steal' Captured the American Right - The New York Times (nytimes.com)



30.     Mr. Yannuzzi, wearing a black sweatshirt and carrying only a backpack, looked on as heavily armed officers pointed at him and began to approach him.



### B. Defendant Jossi Unconstitutionally Searched Mr. Yannuzzi

31.     Denver dispatched Defendant Jossi to Cheeseman Park as a part of the DPD Special Operations Response Team.

32.     Immediately upon arrival, Defendant Jossi observed a man standing in the park next to another protestor. This man was Mr. Yannuzzi.

33.     Mr. Yannuzzi was not carrying anything observable that could be considered a weapon.

34.     Defendant Jossi observed that Mr. Yannuzzi had on baggy pants and black clothing and was wearing a backpack.

35.     Defendant Jossi knew that wearing a backpack in Denver is not illegal.

36.     Defendant Jossi knew of no information that Mr. Yannuzzi posed a risk to the safety of police officers or anyone else.

37.     Based on Mr. Yannuzzi's attire, Defendant Jossi believed that Mr. Yannuzzi was associated with the Black Lives Matter movement or Antifa, the organizers of the counter-protest.

38.     At the time Defendant Jossi saw Mr. Yannuzzi, he was standing in a public park with a small group of fellow protestors.

39.     Defendant Jossi grabbed Mr. Yannuzzi within moments of her arrival.

40.     Defendant Jossi searched Mr. Yannuzzi. Defendant Jossi did not have a warrant authorizing this search.

41.     Defendant Jossi searched Mr. Yannuzzi without probable cause to believe that he was committing a crime.

42.     At the time Defendant Jossi stopped and searched Mr. Yannuzzi, she had not observed him carrying anything that could be reasonably considered a weapon.

43.     Defendant Jossi claimed that she saw a lump in Mr. Yannuzzi's sweatshirt.

44.     Defendant Jossi had nothing more than a hunch that Mr. Yannuzzi was in possession of anything that could possibly be considered a weapon.

45.     Defendant Jossi had nothing more than a hunch that Mr. Yannuzzi was associated with the protestors.

46.     Defendant Jossi searched Mr. Yannuzzi without his consent.

47.     Defendant Jossi searched Mr. Yannuzzi without lawful justification under any exception to the warrant requirement.

48.     Defendant Jossi knew that seizing a person without a warrant or probable cause and then searching that person without a warrant, probable cause, consent, or an exception to the warrant requirement violates that person's constitutional rights.

49. During Defendant Jossi's unconstitutional search of Mr. Yannuzzi, she discovered an object she believed were brass knuckles. Defendant Jossi then arrested Mr. Yannuzzi.

## C. Denver Dismissed the Case Against Mr. Yannuzzi

50. Initially, Denver charged Mr. Yannuzzi in case 21GS000454 with possession of a dangerous weapon in violation of D.R.M.C. 38-117.

51. After reviewing the case, Denver dismissed all charges against Mr. Yannuzzi.

52. On December 21, 2021, Mr. Yannuzzi filed a complaint against Denver Police Officers and Denver City Officials. In his complaint, Mr. Yannuzzi alleged that Defendant Jossi and the individuals in the chain of command responsible for ordering her to search him, violated his right to be free from unreasonable searches and seizures.

53. Mr. Yannuzzi's complaint resulted in an Internal Affairs investigation (IA #2021-39066). DPD's Internal Affairs Bureau spent nine months investigating Mr. Yannuzzi's complaint.

54. On October 7, 2022, DPD Internal Affairs Bureau Commander Magen Dodge sent Mr. Yannuzzi a letter declining to take action against the officers who stopped and searched Mr. Yannuzzi. In that letter, Commander Dodge stated that "[o]fficers were are Cheesman (*sic*) Park contacting persons believed to be preparing for the protest/march by equipping themselves with gas masks, shields, medical supplies, and various items that are commonly used by citizens in the these situations against law enforcement, peaceful protestors and the community." Commander Dodge continued, "you and your friend were identified, through visible observations as being possible participants in the planned protest."

55. DPD's Internal Affairs Bureau concluded that Defendant Jossi did not violate Denver policy because, as records Mr. Yannuzzi has secured through open records requests have revealed, Defendant Jossi was doing exactly what Denver told her to do: execute a mass search and seizure policy against protestors believed to be associated with the Black Lives Matter movement or Antifa.

56. Records from the Internal Affairs investigation demonstrate that Denver, acting through Lieutenant Rebeterano, created an unconstitutional mass search and seizure policy to apply to Inauguration Day protestors. The records further reveal that Denver, acting through City Attorney Bordofsky, Division Chief Montoya, and Commander O'Donnell, approved and implemented the unconstitutional mass search and seizure policy, and that the mass search and seizure policy specifically instructed DPD line officers, including Defendant Jossi, to violate protestors' constitutional rights.

## D. Through Defendant Rebeterano, Denver Wrote an Unconstitutional Mass Search & Seizure Policy Authorizing Mass Suspicionless Searches and Seizures of Protestors

57. Before DPD officers arrived at Cheeseman Park, a DPD Lieutenant, Defendant Rebeterano wrote an operations plan to address the anticipated Inauguration Day protestors.

58. Defendant Rebeterano created this plan at Denver's request in response to DPD "intelligence reports" that protestors associated with left-leaning political groups were planning a day

of demonstrations to protest the "Stop the Steal" movement. DPD's gathered this information by
monitoring left-leaning organizations' social media sites.



59.     Denver tasked Defendant Rebeterano with creating an operations plan for
responding to the anticipated Inauguration Day protestors.

60.     In response, Defendant Rebeterano drafted a policy that instructed DPD officers
that they were authorized to stop and search any protestor carrying any object. This unconstitutional
mass search and seizure policy was titled *Denver Police Department in Coordination with Colorado State
Patrol Operations Plan. Presidential Inauguration.*

61.     The policy relied on an obviously unconstitutional interpretation of then-existing city
ordinance D.R.M.C. § 38-117(b). Then-existing D.R.M.C. § 38-117(b) made it illegal for a person to
carry a "dangerous or deadly weapon." The ordinance further defined "dangerous or deadly
weapon" to include a number of specific weapons, as well as "any other dangerous or deadly
weapon." As such, the ordinance defined "dangerous or deadly weapon" as "dangerous or deadly
weapon," a meaningless definition.

62.     Seizing on the poor drafting of the ordinance, Defendant Rebeterano interpreted the
ordinance to mean that literally any object qualified as a dangerous or deadly weapon, such that any
person carrying any object in Denver was subject to a stop and search based on a potential violation
of D.R.M.C. § 38-117(b).

63.     Defendant Rebeterano knew that this interpretation of D.R.M.C. § 38-117(b) was
unconstitutional. He knew that it was not constitutional for a Denver police officer to stop and
search any person in Denver simply because that person was carrying an object. Despite this
knowledge, he went forward with writing a mass search and seizure policy that authorized DPD
officers to act on his unconstitutional interpretation of the ordinance.

64.     Having written the unconstitutional policy, Defendant Rebeterano next created a
training PowerPoint for use to train DPD officers and supervisors concerning how they should

8

carry out the unconstitutional mass search and seizure policy. Defendant Rebeterano's titled this
training PowerPoint *Violence Mitgation Teams: Reducing Violence and Ensuring Peaceful Protests.* ("VMT").
Defendant Rebeterano's VMT PowerPoint described the unconstitutional mass search and seizure
policy and how it should be implemented against Inauguration Day protestors.

65.    The mass search and seizure policy training PowerPoint instructed DPD officers to
stop and detain any protestor carrying an object. The policy authorized DPD officers to ignore the
Colorado Constitution under the guise of public safety, authorizing DPD officers to conduct mass
suspicionless stops and searches of any protestor. Defendant Rebeterano thus created a mass search
and seizure policy and training program that instructed DPD officers they were authorized to stop,
detain, search, and seize any person for carrying any object at the protest.

### E.  Through Defendant Bordofsky, Denver Gave Legal Approval to the Unconstitutional
Mass Search & Seizure Policy and Training

66.    Defendant Rebeterano worked closely with a Denver City Attorney, Defendant
Bordofsky, while creating the unconstitutional mass search and seizure policy. Defendant Bordofsky
helped Defendant Rebeterano develop the policy.

67.    Defendant Rebeterano, after drafting the unconstitutional mass search and seizure
policy and the VMT PowerPoint training, submitted both to Defendant Bordofsky for legal review.

68.    Defendant Bordofsky reviewed both (1) Defendant Rebeterano's VMT PowerPoint
training for line officers and supervisors, and (2) and the unconstitutional mass search and seizure
policy described in the PowerPoint training's slides.

69.    Defendant Bordofsky approved the unconstitutional mass search and seizure policy
and the VMT PowerPoint training.

70.    Defendant Bordofsky gave her legal approval to the unconstitutional mass search
and seizure policy and the training to implement it despite knowing that both relied on an
unconstitutional interpretation of D.R.M.C. § 38-117(b).

71.    As an experienced attorney and the head of the Denver City Attorney's Office's
Prosecutions Unit, Defendant Bordofsky knew that it is not constitutional to make it illegal to carry
an object in the City of Denver, nor is it constitutional to subject anyone carrying an object in the
City of Denver to a seizure and a search.

72.    Despite this knowledge, and despite knowing that based on her approval the
unconstitutional policy would be implemented and result in mass violations of constitutional rights,
Defendant Bordofsky approved the unconstitutional policy and training.

### F.  Through Defendant Montoya, Denver Ordered DPD Line Officers and their
Supervisors to Execute the Unconstitutional Mass Search & Seizure Policy

73.    Defendant Bordofsky and Defendant Rebeterano sent the mass search and seizure
policy and training to the Office of Denver Chief of Police Paul Pazen for implementation. Then-
Chief Pazen delegated final approval and implementation of the policy and training to Defendant
Montoya. Defendant Montoya was thus the final decisionmaker and policymaker for Denver

concerning the adoption of the unconstitutional mass search and seizure policy and the implementation of it through the VMT PowerPoint training.

74.    At the time that Defendant Bordofsky approved the mass search and seizure policy and sent it to the Chief's office for review, Defendant Montoya was DPD's Division Chief of Investigations.

75.    In DPD, Division Chiefs report directly to the Chief of Police. As DPD's Division Chief of Investigations, Defendant Montoya oversaw all specialized investigative units, task forces, and special operations forces including the special operations forces tasked with executing the mass search and policy outlined in the VMT PowerPoint.

76.    Defendant Montoya reviewed Defendant Rebeterano's unconstitutional mass search and seizure policy as well as the VMT PowerPoint training. After review, he ordered its implementation. Acting as a representative of the Denver Chief of Police's Office, he explicitly approved the implementation of Defendant Rebeterano's VMT PowerPoint training and the unconstitutional mass search and seizure policy it taught DPD line officers to follow.

## G.  Through Defendant O'Donnell, Denver Explicitly Instructed DPD Line Officers to Execute the Unconstitutional Mass Search & Seizure Policy at a Roll Call Briefing

77.    Denver assigned Defendant O'Donnell to be the Commander responsible for carrying out the mass search and seizure policy on January 20, 2021.

78.    That day, Defendant O'Donnell held a roll call meeting and supervisor briefing. The purpose of this meeting was to instruct DPD officers and ground-level supervisors on how to implement the unconstitutional mass search and seizure policy with the VMT PowerPoint.

79.    During the roll call meeting, Defendant O'Donnell used the VMT PowerPoint to instruct DPD line officers to follow Denver's unconstitutional mass search and seizure policy.

80.    At the roll call meeting, Defendant O'Donnell instructed DPD officers to stop, search, and detain anyone carrying anything that appeared to be "riot materials."

81.    Defendant O'Donnell further instructed DPD officers that "riot materials" could be virtually anything, including water bottles, backpacks, and other items that are plainly legal for a person to possess and carry in the City of Denver.

82.    Defendant O'Donnell instructed DPD line officers and supervisors to stop, search, and detain protestors carrying objects even where those objects were not weapons.

83.    Defendant Jossi was one of the DPD line officers present at Defendant O'Donnell's roll call briefing. She heard his orders and acted on them, directly leading to her unconstitutional stop and seizure of Mr. Yannuzzi.

## H.  Denver Created an Operations Command Post to Assist in Executing its Unconstitutional Mass Search and Seizure Policy

84.    To help implement Denver's unconstitutional mass search and seizure policy at the ground level, DPD created an Operations Command Post.

85.    The officials inside the Command Post were responsible for giving orders to and answering questions from DPD line officers and supervisors concerning the mass search and seizure policy.

86.    Denver assigned Defendant O'Donnell to be the Incident Commander in charge of the on-the-ground implementation of the mass search and seizure policy at Cheeseman Park. Defendant O'Donnell was the highest ranking DPD officer in the Command Post.

87.    Denver also assigned Defendant Bordofsky to be in the Command Post.

88.    Defendant Bordofsky's role in the Command Post was to give real-time legal advice to Defendant O'Donnell and the DPD line officers and supervisors as they carried out the unconstitutional mass search and seizure policy against the protestors.

89.    On January 20, 2021, when protestors began to assemble in Cheeseman Park, Defendant O'Donnell communicated with Defendant Bordofsky about which protestors DPD officers should engage with, stop, or search.

90.    Before giving orders to carry out the mass search and seizure policy, Defendant O'Donnell asked Defendant Bordofsky if his orders were legal.

91.    From her Command Post position, Defendant Bordofsky approved Defendant O'Donnell's orders.

92.    Having received approval from Defendant Bordofsky, Defendant O'Donnell instructed his line officers, including Defendant Jossi, to stop, search, and detain any protestors carrying any objects regardless of whether those objects resembled a dangerous or deadly weapon.

93.    While the protestors were assembling, Defendant Jossi radioed to the Command Post to ask if she should contact an unknown man who turned out to be Mr. Yannuzzi. Defendant Jossi relayed that the unknown man was carrying a backpack and wearing black clothing, but had nothing in his hands.

94.    After conferring with Defendant Bordofsky and securing her legal approval, Defendant O'Donnell instructed Defendant Jossi to stop and search Mr. Yannuzzi.

**I.    During the Protest, Defendants Bordofsky and O'Donnell Gave DPD Line Officers Additional Unconstitutional Orders to Stop and Search Anyone They Believed Was Associated with the Black Lives Matter Movement or Antifa**

95.    Acting under the authority delegated to her by Denver, Defendant Bordofsky interpreted Denver's already unconstitutional mass search and seizure policy in a way that rendered it further unconstitutional.

96.    Specifically, Defendant Bordofsky decided that Denver's mass search and seizure policy authorized the stopping and searching of anyone DPD line officers believed to be associated

with the Black Lives Matter movement or Antifa, even if that person did not appear to possess an object.

97.    Defendant Bordofsky gave legal approval for Defendant O'Donnell to tell his line officers, including Defendant Jossi, to stop and search anyone who they believed appeared to be associated with the Black Lives Matter movement or Antifa, regardless of whether that person appeared to be carrying anything.

98.    Defendant Bordofsky's further interpretation of the already unconstitutional mass search and seizure policy made the policy doubly unconstitutional because Defendant Bordofsky gave DPD line officers legal approval to stop people based on perceived associations with particular political groups.

99.    As uncovered through open records requests, on January 20, 2021, Defendant O'Donnell and Defendant Bordofsky were working with DPD's Intelligence Unit. DPD's Intelligence Unit was an undercover team that assigned plain-clothes agents to surveil the protestors assembled at Cheeseman Park.

100.    Denver tasked the Intelligence Unit with identifying who among the assembled protestors appeared to be associated with the Black Lives Matter movement or Antifa.

101.    Defendant O'Donnell and Defendant Bordofsky then communicated with these undercover officers seeded throughout Cheeseman Park. These undercover intelligence agents informed Defendants O'Donnell and Bordofsky, as well as the other police officers in the Operations Command Post that certain of the protestors assembled at Cheeseman Park, including Mr. Yannuzzi, were associated with the Black Lives Matter movement or Antifa.

102.    Defendant Jossi also believed that Mr. Yannuzzi was associated with the Black Lives Matter movement or Antifa, and communicated this to Defendants O'Donnell and Bordofsky.

103.    Based on the undercover intelligence agents' speculation that Mr. Yannuzzi may be associated with the Black Lives Matter movement or Antifa, Defendant Jossi's similar speculation, and Mr. Yannuzzi's possession of an object (specifically, a backpack), Defendant Bordofsky and Defendant O'Donnell directed Defendant Jossi to stop and search Mr. Yannuzzi.

### J.    Defendant Jossi Followed the Unconstitutional Order to Stop and Search Mr. Yannuzzi That She Received from Defendants Bordofsky and O'Donnell

104.    Before engaging Mr. Yannuzzi, Defendant Jossi communicated with Defendant O'Donnell in the Operations Command Post and asked if she should "Contact them?", referring to Mr. Yannuzzi and the friend with whom he was walking.

105.    In consultation with Defendant Bordofsky, Defendant O'Donnell authorized Defendant Jossi to contact Mr. Yannuzzi and his friend, a fellow protestor.

106.    Defendant Jossi sought to stop and search Mr. Yannuzzi for two reasons. First, he was carrying a backpack. Pursuant to the instructions she received at the roll call briefing based on the VMT PowerPoint training, this meant she was supposed to stop and search Mr. Yannuzzi. Second, based on Mr. Yannuzzi's clothing, she suspected he was associated with the Black Lives

Matter movement or Antifa. Pursuant to instructions she had received from Defendants O'Donnell and Bordofsky, this also meant she was supposed to stop and search Mr. Yannuzzi. For these two reasons, Defendant Jossi radioed the Command Post, described her observations of Mr. Yannuzzi, and asked if she should stop and search him. After conferring with Defendant Bordofsky, Defendant O'Donnell responded in the affirmative.

107. The orders Defendant Jossi executed were part of Denver's unconstitutional mass search and seizure policy.

108. The orders Defendant Jossi executed were additionally unconstitutional because they were applied against people like Mr. Yannuzzi based on a speculative belief that Mr. Yannuzzi was associated with the Black Lives Matter movement or Antifa.

109. At the time Defendant Jossi executed her unlawful stop and search of Mr. Yannuzzi, Mr. Yannuzzi was not carrying anything that resembled a weapon. His hands were empty.

### K. Defendant Jossi's Unconstitutional Search and Seizure of Mr. Yannuzzi Had A Chilling Effect on Mr. Yannuzzi's Rights to Free Association and Assembly

110. Up to and including January 20, 2021, a significant part of Mr. Yannuzzi's identity was that he was a protestor. Though he was not born into a position that afforded him access to the halls of power, Mr. Yannuzzi felt strongly that he should nonetheless use the power he had – the physical presence of his body – to stand up for what he believed in and thereby try to make the world a better place. In furtherance of this belief, as protest movements arose in the summer of 2020 and organized protests, Mr. Yannuzzi regularly joined them, doing what he could with the power that he had to try to fight the right-wing forces he saw sweeping the country.

111. At the time Defendant Jossi carried out the orders to stop and search Mr. Yannuzzi, Mr. Yannuzzi was engaged in the constitutionally protected activity of assembling in public to protest fascism and right-wing threats to democracy.

112. By meeting up with people at Cheeseman Park based on their shared his beliefs, Mr. Yannuzzi was also engaged in the constitutionally protected activity of association.

113. Defendants Jossi, O'Donnell, and Bordofsky's decisions to stop and search Mr. Yannuzzi were motivated as a response to these Defendants' belief that Mr. Yannuzzi was associated with the Black Lives Matter movement or Antifa.

114. Subjecting perceived members of political groups to suspicionless searches is sufficient to chill a person of ordinary firmness from exercising their rights to freedom of association and assembly.

115. Since his unlawful search and seizure on January 20, 2021, which led to him being arrested and charged with a crime, Mr. Yannuzzi has not attended another protest. By targeting Mr. Yannuzzi based on his beliefs, associations, and choice to assemble in public to advocate for those beliefs, Defendants Jossi, O'Donnell, and Bordofsky deterred him from engaging in further constitutionally protected activity.

**L. In the Wake of Denver's Violent Response to the George Floyd Protests, Denver Promised the Public It Would No Longer Engage in Mass Violations of People's Constitutional Rights. That Was a Lie.**

116. On May 25, 2020, George Floyd was murdered by police officers in Minneapolis, sparking nationwide protests against police violence, including in Denver.

117. DPD's response to these protests was to violate the protestors' rights on a massive and systemic scale.

118. The individual officers' widespread misconduct against protestors demonstrated that DPD as a whole had a policy and practice of violating the constitutional rights of protestors, as found by a federal jury.[2] This led to Denver paying out millions of dollars in lawsuits stemming from DPD officers' unconstitutional behavior in response to the George Floyd protests.[3]

119. Claire Sannier was awarded $1 million after a jury found that DPD officers violated her constitutional rights during the George Floyd protests. Stanford Smith was awarded $1 million after a jury found that DPD officers violated his constitutional rights during the George Floyd protests. Zachary Packard was awarded $3 million after a jury found that DPD officers violated his constitutional rights during the George Floyd protests. Sara Fitouri was awarded $1 million after a jury found that DPD officers violated her constitutional rights during the George Floyd protests. Maya Rothlein was awarded $1 million after a jury found that DPD officers violated her constitutional rights during the George Floyd protests. Amanda Blasingame was awarded $1 million after a jury found that DPD officers violated her constitutional rights during a protest. Joe Deras was awarded $1 million after a jury found that DPD officers violated his constitutional rights during the George Floyd protests. Elle Taylor was awarded $1 million after a jury found that DPD officers violated her constitutional rights during the George Floyd protests. Ashlee Wedgeworth was awarded $750,000 after a jury found that DPD officers violated her constitutional rights during the George Floyd protests. Jackie Parkins was awarded $1 million after a jury found that DPD officers violated her constitutional rights during the George Floyd protests. Elisabeth Epps was awarded 1 million in compensatory damages and $250,000 in punitive damages after a jury found that DPD officers violated her constitutional rights during the George Floyd protests. Hollis Lyman was awarded $1 million after a jury found that DPD officers violated her constitutional rights during the George Floyd protests. Many other protestors came to settlements with Denver, resulting in Denver paying out additional millions of dollars to compensate for DPD officers' unconstitutional actions in response to the George Floyd protests.

120. Responding DPD's mass violation of protestors' rights, Denver commissioned the Office of the Independent Monitor ("OIM") to investigate DPD's response to the George Floyd protests.

121. This investigation found that the Denver violated protestors' rights on a massive, systemic, widespread scale.[4]

---

[2] Jury finds Denver police violated rights of protestors during 2020 George Floyd demonstrations; awards $14M | News | denvergazette.com
[3] Federal jury awards BLM protestors $14 million in compensatory and punitive damages (dailykos.com)
[4] The Police Response to the 2020 George Floyd Protests in Denver, an Independent Review (denvergov.org)

122.     Denver released the report and publicly claimed it would undertake significant reforms to ensure that DPD would no longer engage in mass violations of protestors rights.[5] This *mea culpa* earned Denver significant positive media coverage, which was Denver's goal.[6]

123.     Then-Chief of Police Paul Pazen commented on the findings of the OIM report: "It is imperative for us, who consider ourselves a learning organization to identify the challenges, the gaps that we faced during this unprecedented five days . . . . We will use this report. We will use these recommendations so that that way we can improve in the future." However, despite these statements, Denver actually learned nothing.

124.     As Mr. Yannuzzi's case demonstrates, behind the scenes Denver made no such reforms. Just 43 days after the OIM report found "extremely troubling police tactics" and after DPD's Chief of Police promised significant reform, Denver once again responded to a planned protest by ordering its officers to engage in mass violations of the protestors' constitutional rights.

125.     Rather than make good on its assurances that widespread police misconduct would not be replicated, DPD concocted and carried out an unconstitutional mass search and seizure operation against nonviolent protestors.

126.     This has to stop. Mr. Yannuzzi seeks to hold the Defendants, the DPD, and the City of Denver accountable for violating his constitutional rights.

**C.R.S. § 13-17-201(2)**

127.     The Colorado Supreme Court has yet to issue rulings concerning the elements of the state causes of action that Mr. Yannuzzi brings in this Complaint.

128.     Pursuant to C.R.S. § 13-17-201(2), Mr. Yannuzzi brings the below state causes of action for the purpose of seeking a remedy for the violation of his rights he has suffered and also with the express purpose to: (a) extend and modify existing precedent and create new precedent on matters of first impression concerning the elements of the state causes of action he brings in this Complaint; and (b) establish the meaning of the state causes of action he brings in this Complaint.

129.     Pursuant to C.R.S. § 13-17-201(2), Mr. Yannuzzi brings the below federal causes of action for the purpose of seeking a remedy for the violation of his rights he has suffered and also with the express purpose to: create precedent on questions of first impression and extend precedent where it has begun to be developed concerning the effect of Denver's and its employees' decisions to direct DPD line officers to enforce a plainly unconstitutional interpretation of Denver ordinance.

**<u>STATEMENT OF CLAIMS FOR RELIEF</u>**

**FIRST CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. art. II, sec. 7 - Unlawful Seizure and Search**
**(Defendant Jossi)**

---

[5] https://kdvr.com/news/local/denver-police-department-responds-to-oim-report-agrees-with-all-recommendations/
[6] Denver police chief, public safety executive director respond to OIM protest report - YouTube

130.     Mr. Yannuzzi incorporates all other paragraphs as if fully set forth herein.

131.     At all relevant times, Defendant Jossi was acting as a peace officer employed by a local government under the color of state law in her capacity as a Denver law enforcement officer.

132.     Mr. Yannuzzi had a right under article II, section 7 of the Colorado Constitution to be secure in his person and effects from unreasonable searches and seizures.

133.     Defendant Jossi unreasonably seized Mr. Yannuzzi by stopping him without legal justification.

134.     Defendant Jossi unreasonably searched Mr. Yannuzzi's when she searched his person and his backpack without legal justification.

135.     In so doing, Defendant Jossi caused Mr. Yannuzzi to be subjected to the deprivation of individual rights secured by the Bill of Rights of the Colorado Constitution.

136.     Defendant Jossi's acts were the moving force behind, and the proximate cause of Defendant Jossi's subsequent initiation of criminal charges against Mr. Yannuzzi.

137.     Defendant Jossi's acts or omissions violated Mr. Yannuzzi's state constitutional rights and were a substantial and significant contributing cause and proximate cause of Mr. Yannuzzi's damages.

## SECOND CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. art. II, sec. 7 - Unlawful Seizure and Search
### (Defendants Rebeterano, O'Donnell, and Montoya)

138.     Mr. Yannuzzi incorporates all other paragraphs as if fully set forth herein.

139.     At all relevant times, Defendants Rebeterano, O'Donnell, and Montoya were acting as peace officers employed by a local government under the color of state law in their capacities as Denver law enforcement officers.

140.     In the manner described above, Defendants Rebeterano, O'Donnell, and Montoya were personally involved in and personally directed, controlled, or authorized the actions of their fellow officers, who violated Mr. Yannuzzi's constitutional rights.

141.     Defendants Rebeterano, O'Donnell, and Montoya created, authorized, promulgated, and implemented the unconstitutional mass search and seizure policy.

142.     Defendants Rebeterano, O'Donnell, and Montoya's actions, direction, and control caused the constitutional violations complained of in Claim 1. By writing, authorizing, and ordering the implementation of the unconstitutional mass search and seizure policy, they set in motion a series of events that they knew or reasonably should have known would cause their fellow officers to deprive people such as Mr. Yannuzzi of their constitutional rights.

143.    Defendants Rebeterano, O'Donnell, and Montoya knew of and acquiesced in the constitutional violations committed by their fellow officers. In so doing, these Defendants caused the violation of Mr. Yannuzzi's constitutional rights.

144.    As a direct and proximate result of Defendants Rebeterano, O'Donnell, and Montoya's actions, DPD officers violated Mr. Yannuzzi's constitutional rights.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment - Unlawful Seizure and Search**
**(Defendant Bordofsky)**

145.    Mr. Yannuzzi incorporates all other paragraphs as if fully set forth herein.

146.    At all relevant times, Defendant Bordofsky was acting under the color of state law in her capacities as a Denver City Attorney.

147.    In the manner described above, Defendant Bordofsky was personally involved in and personally directed, controlled, or authorized the actions of DPD officers, who violated Mr. Yannuzzi's constitutional rights.

148.    Defendant Bordofsky helped create, authorize, promulgate, and implement the unconstitutional mass search and seizure policy.

149.    Defendant Bordofsky's actions, direction, and control caused the constitutional violations complained of in Claim 1. By helping write, authorize, and order the implementation of the unconstitutional mass search and seizure policy, she set in motion a series of events that she knew or reasonably should have known would cause DPD officers to deprive people such as Mr. Yannuzzi of their constitutional rights.

150.    Defendant Bordofsky knew of and acquiesced in the constitutional violations committed by DPD officers. In so doing, she caused the violation of Mr. Yannuzzi's constitutional rights.

151.    As a direct and proximate result of Defendant Bordofsky's actions, DPD officers violated Mr. Yannuzzi's constitutional rights.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment - Unlawful Seizure and Search**
**(Defendant Denver)**

152.    Mr. Yannuzzi incorporates all other paragraphs as if fully set forth herein.

153.    Denver established a policy and practice of directing and authorizing police officers to stop and search anyone carrying any item that an officer thought could hypothetically be used as a weapon. Because any item can hypothetically be used as a weapon, Denver's established policy and practice authorized officers to stop, search, and detain anyone carrying anything.

154. First, Denver delegated the drafting of this policy to Defendant Rebeterano. Defendant Rebeterano drafted the unconstitutional policy. Denver delegated its legal review of this policy to Defendant Bordofsky. Defendant Bordofsky reviewed Defendant Rebeterano's policy. On behalf of Denver, Defendant Bordofsky approved the unconstitutional policy. Defendant Bordofsky sent the unconstitutional policy to the Office of the Denver Chief of Police for final approval and implementation. Denver Police Chief Pazen delegated the review and implementation of this policy to Defendant Montoya. Acting as the final decision maker for Denver, Defendant Montoya approved the implementation of the unconstitutional mass search and seizure policy.

155. To implement this unconstitutional mass search and seizure policy Defendant Montoya directed Commander O'Donnell to instruct DPD line officers and their ground level supervisors to carry out the mass search and seizure policy. Defendant O'Donnell acted on Defendant Montoya's unconstitutional direction and held a roll call meeting where he instructed DPD line officers, including Defendant Jossi, to follow the mass search and seizure policy.

156. As explained herein, this policy and practice caused Mr. Yannuzzi to be deprived of his rights under the Fourth Amendment to be free from unreasonable searches and seizures. Denver is therefore liable for what inevitably happened when its police officers, including Defendant Jossi, followed this policy and implemented it against Mr. Yannuzzi.

157. This unconstitutional mass search and seizure policy, and the practice by which it was carried out, was the direct and proximate cause of Mr. Yannuzzi's constitutional rights being violated and was the direct and proximate cause of Mr. Yannuzzi's damages.

### FIFTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. art. II, sec. 10 - Freedom of Association and Assembly
### (Defendant Jossi)

158. Mr. Yannuzzi incorporates all other paragraphs as if fully set forth herein.

159. At all relevant times, Defendant Jossi was acting as a peace officer employed by a local government under the color of state law in her capacity as a Denver law enforcement officer.

160. Mr. Yannuzzi was engaged in a political protest, an activity protected by article II, section 10 of the Colorado Constitution.

161. Defendant Jossi's actions, subjecting Mr. Yannuzzi to an unlawful seizure and search, caused Mr. Yannuzzi to suffer an injury that would reasonably have a chilling effect on a person of ordinary firmness in the person's exercise of the right of free association and assembly.

162. Defendant Jossi's actions were substantially motivated as a response to Mr. Yannuzzi's exercise of constitutionally protected conduct.

163. Defendant Jossi's actions were motivated by her belief that Mr. Yannuzzi was associated with either the Black Lives Matter movement or Antifa.

164. Defendant Jossi's actions caused Mr. Yannuzzi substantial harm and were a proximate cause of Mr. Yannuzzi's damages.

## SIXTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. art. II, sec. 10 - Freedom of Association and Assembly
### (Defendant O'Donnell)

165.     Mr. Yannuzzi incorporates all other paragraphs as if fully set forth herein.

166.     At all relevant times, Defendant O'Donnell was acting as a peace officer employed by a local government under the color of state law in his capacity as a Denver law enforcement officer.

167.     In the manner described above, Defendant O'Donnell was personally involved in and personally directed, controlled, and authorized the actions of his subordinate officers who violated Mr. Yannuzzi's constitutional rights.

168.     Defendant O'Donnell's actions, direction, and control caused the constitutional violations complained of in Claim 5. By authorizing and ordering his subordinates to execute a mass search and seizure policy against Mr. Yannuzzi based on a belief that he was associated with the Black Lives Matter movement or Antifa, he set in motion a series of events that he knew or reasonably should have known would cause his subordinates to deprive Mr. Yannuzzi of his constitutional rights.

169.     Defendant O'Donnell directed, knew of, and acquiesced in the constitutional violations committed by his subordinates. In so doing, Defendant O'Donnell deliberately caused the violation of Mr. Yannuzzi's constitutional rights.

170.     By authorizing Defendant Jossi to stop and search protestors based on a belief that the person was associated with the Black Lives Matter movement or Antifa, Defendant O'Donnell caused Mr. Yannuzzi to suffer an injury that would reasonably be expected to have a chilling effect on the exercise of the rights to free association and assembly by a person of ordinary firmness.

171.     Defendant O'Donnell's decision to authorize Defendant Jossi to subject Mr. Yannuzzi to an unlawful search was motivated by Defendant O'Donnell's belief that Mr. Yannuzzi was associated with the Black Lives Matter movement or Antifa.

172.     As a direct and proximate result of Defendant O'Donnell's actions, Mr. Yannuzzi's constitutional rights were violated.

## SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment - Freedom of Association and Assembly
### (Defendant Bordofsky)

173.     Mr. Yannuzzi incorporates all other paragraphs as if fully set forth herein.

174.     At all relevant times, Defendant Bordofsky was acting within the scope of her official duties and employment and under color of state law in her capacity as a Denver City Attorney.

175. In the manner described above, Defendant Bordofsky was personally involved in and personally approved the mass search and seizure policy which violated Mr. Yannuzzi's constitutional rights. Defendant Bordofsky decided for Denver that Denver's mass search and seizure policy further authorized the stopping and searching of anyone that DPD line officers believed to be associated with the Black Lives Matter movement or Antifa, even if that person did not appear to possess any object.

176. Defendant Bordofsky was assigned to the Command Post where she was tasked with providing real time legal advice to DPD line officers, including Defendant Jossi. From the Command Post, Defendant Bordofsky authorized Defendant O'Donnell and his line officers including Defendant Jossi to stop and search anyone they believed may be associated with the Black Lives Matter movement or Antifa, regardless of whether that person appeared to possess any object. In so doing, Defendant Bordofsky caused the violation described in Claim 5.

177. By authorizing Defendant O'Donnell and Defendant Jossi to execute this policy, Defendant Bordofsky caused Mr. Yannuzzi to suffer an injury that would reasonably be expected to have a chilling effect on the exercise of the rights to free association and assembly by a person of ordinary firmness.

178. Defendant Bordofsky's decision to authorize Defendants O'Donnell and Jossi to subject Mr. Yannuzzi to an unlawful search was motivated by Defendant Bordofsky's belief that Mr. Yannuzzi was associated with the Black Lives Matter movement or Antifa.

179. As a direct and proximate result of Defendant Bordofsky authorizing Defendants O'Donnell and Jossi to unconstitutionally seize and search Mr. Yannuzzi based on a belief he was associated with the Black Lives Matter movement or Antifa, Defendant Bordofsky caused Mr. Yannuzzi substantial harm and was a proximate cause of Mr. Yannuzzi's damages.

## EIGHTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment - Freedom of Association and Assembly
### (Defendant Denver)

180. Mr. Yannuzzi incorporates all other paragraphs as if fully set forth herein.

181. As detailed in Claim 4, Denver created and enforced an unconstitutional policy directing its officers to stop, search, and detain any protestor in possession of an object.

182. To ensure implementation of this policy, Denver delegated to Defendant Bordofsky and Defendant O'Donnell the responsibility to answer questions from DPD line officers concerning how to implement the unconstitutional mass search and seizure policy.

183. Acting under the authority delegated to them by Denver, Defendant Bordofsky interpreted Denver's already unconstitutional mass search and seizure policy in a way that rendered it doubly unconstitutional. Specifically, Defendant Bordofsky decided for Denver that the policy authorized the stopping and searching of anyone that DPD line officers believed to be associated with the Black Lives Matter movement or Antifa.

184.    Defendant O'Donnell, acting under the authority Denver granted him as the Operations Commander, executed Defendant Bordofsky's further unconstitutional interpretation of the already unconstitutional mass search and seizure policy.

185.    The result of Defendants Bordofsky and O'Donnell's decisions, made with authority granted them by Denver, was the creation of an unconstitutional practice and policy of stopping, searching, and detaining, protestors based on DPD line officers' speculation about the protestors' political beliefs based on their appearance.

186.    Mr. Yannuzzi was engaged in a political protest, an activity protected by the First Amendment.

187.    Denver's policy and practice caused Mr. Yannuzzi to be deprived of his rights under the First Amendment right to freedom of association and assembly, as detailed in Claim 5.

188.    By authorizing DPD supervisors and line officers to execute its unconstitutional mass search and seizure policy against people believed to be associated with the Black Lives Matter movement or Antifa, Denver authorized an unconstitutional policy and practice that violated individuals' constitutional rights to the freedom of association and assembly.

189.    Denver, through its unlawful search and seizure policy that was executed specifically against Black Lives Matter movement and Antifa protestors, caused Mr. Yannuzzi to suffer an injury that would reasonably have a chilling effect on the exercise of the right to free association and free assembly activity by a person of ordinary firmness.

190.    Denver's implementation of this policy against Mr. Yannuzzi would chill a person of ordinary firmness from exercising their First Amendment rights to freedom of association and assembly.

191.    Denver's implementation of this unconstitutional policy caused Mr. Yannuzzi substantial harm and was a proximate cause of Mr. Yannuzzi's damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Yannuzzi respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to:

a.    A judgment that the acts of Defendants described herein violated the Colorado Constitution and the United States Constitution;

b.    Compensatory damages according to proof at trial, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

c.    Injunctive relief, as appropriate;

d.    Attorney's fees and costs;

e.  Prejudgment and post-judgment interest at the highest possible rate; and

f.  Such further relief as the Court may deem just, proper, and appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: January 19, 2023

_____

Adam Frank #38979
Cameron Bedard #52362
Frank Law Office LLC
1133 N Pennsylvania St.
Denver, CO 80203
Phone: (303) 800-8222
Fax: (303) 800-9122
adam@franklawoffice.com
cameron@franklawoffice.com

ATTORNEYS FOR PLAINTIFF